UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SNOHOMISH COUNTY,<br><br>Plaintiff,<br><br>v.<br><br>ALLIED WORLD NATIONAL ASSURANCE COMPANY, et al.,<br><br>Defendants. | CASE NO. C16-63 BJR<br><br>ORDER GRANTING MOTION FOR SUMMARY JUDGMENT BY SNOHOMISH COUNTY AND DENYING MOTION FOR SUMMARY JUDGMENT BY THE INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA |

## I.     Introduction

This matter is before the Court on cross-motions for summary judgment between Plaintiff Snohomish County ("the County") and Defendant The Insurance Company of the State of Pennsylvania ("ICSOP").   The dispute centers around whether ICSOP owed a duty to defend the County against a series of lawsuits in the wake of a catastrophic landslide in 2014.

Having reviewed the parties' briefing, the relevant case law, and the entire record, the Court will deny ICSOP's motion for summary judgment against the County and grant the County's

motion for summary judgment against ICSOP, finding that ICSOP was contractually obligated to defend the County under its policies and is in breach of that duty.  The Court's reasoning follows:

## II. Background

On March 22, 2014, in Snohomish County, the town of Oso was the scene of a catastrophic mudslide that wreaked havoc on lives and property.  The number of deaths, personal injuries, and  destruction to homes and other property resulted in four lawsuits (hereinafter the "underlying lawsuits").  The underlying lawsuits are *Pszonka v. Snohomish County* (King Co. Sup. Ct. No. 14-2-18401-8-SEA; "*Pszonka*"); *Ward v. Snohomish County*, King Co. Sup. Ct. No. 14-2-2955-4-SEA; "*Ward*"); *Regelbrugge v. State of Washington,* King Co. Sup. Ct. No. 15-2-01672-5-SEA ("*Regelbrugge*"); *Lester v. Snohomish County*, King Co. Sup. Ct. No. 15-2-02908-6-SEA ("*Lester*").

The summary judgment motions before the court involve a dispute between the County and its excess insurer, The Insurance Company of the State of Pennsylvania (hereinafter "ICSOP") as to ICSOP's responsibility for defense costs incurred by the County in the underlying lawsuits.[1] At issue in these summary judgment motions are eight successive annual Special Excess Liability Policies issued by ICSOP.[2]

ICSOP is a "first-layer" excess insurer whose duty to cover and defend the insured begins when the County exhausts its self-insured retention, or "retained limit". The ICSOP Policies have

---

[1] Defendant and cross-claimant Starr Indemnity and Liability Company ("Starr") was also named in the ICSOP summary judgment motion and filed a responsive brief.  The Court will resolve that portion of the motion by separate order.

[2] May 1, 2002 – May 1, 2003 ("2002-03 ICSOP Policy"); May 1, 2003 – May 1, 2004 ("2003-04 ICSOP Policy"); May 1, 2004 – May 1, 2005 ("2004-05 ICSOP Policy"); May 1, 2005 – May 1, 2006 ("2005-06 ICSOP Policy"); May 1, 2006 – March 15, 2007 ("2006-07 ICSOP Policy"); March 15, 2007 – March 15, 2008 ("2007-08 ICSOP Policy"); March 15, 2008 – March 15, 2009 ("2008-09 ICSOP Policy"); March 15, 2009 – March 15, 2010 ("2009-10 ICSOP Policy").  *See* Dkt. No. 203, Declaration of Broker, ¶¶ 3-11, Exs. 1-8. The parties agree that the 2002-03 ICSOP Policy does not carry a duty to defend under any circumstances.

the following terms and features which form the basis of the dispute between the insurer and the County:

- A self-insured retention of at least $1 million;

- Coverage for bodily injury or property damage ("BI/PD") for an accident during the policy period;

- Errors and omissions ("E&O") coverage which does not apply to BI/PD claims arising from "wrongful acts";

- An exclusion for suits for property damage arising out of "land subsidence;"

- An exclusion for suits arising out of the failure of any "dam;"

- An exclusion for claims or suits arising out of a dishonest or fraudulent act;

- A "duty to defend" provision which provides that ICSOP "shall have the right and duty to defend, investigate and settle any claim or suit seeking damages covered by the terms and conditions of this Policy when the applicable limits of … your self-insured retention of the retained limit have been exhausted by payment … [of] defense costs." (*See, e.g.,* Dkt. No. 201, Declaration of Cordell, Ex. F at 8-9.)

The complaints in the underlying litigation centered around the foreseeability of the landslide and what the County knew, or should have known, about the risk to persons and property which the potential of the landslide posed. The following allegations were common to all the underlying lawsuits:

- The County knew of several landslides occurring before 2014 in the same area but failed to address the risks in that area;

- The County knew of scientific research pointing to a serious risk to life and property in the slide area, but did nothing to address the dangers identified by the reports;

- Even though the County was aware of the risks of a major slide in the Oso area, it rejected a voluntary buyout plan for the properties in the Steelhead Haven neighborhood, opting instead for a "slide stabilization project."

In addition to causes of action for wrongful death, bodily injury and property loss or damage, many of the plaintiffs in the underlying litigation brought claims for loss of consortium. A typical loss of consortium claim sought "[d]amages for the loss to Plaintiffs … of decedent's love, care, affection, companionship, guidance and society, economic support and services, and consortium." (*See, e.g.,* Declaration of Cordell, Ex. A at ¶ 73; Ex. B at ¶ 85.B; Ex. C at ¶¶ 2.2-2.4; Ex. D at ¶¶ 1.1, 4.7.)

On September 14, 2016, the underlying lawsuits against the County were dismissed. (Dkt. No. 204, Declaration of Meyers, Exs. 1, 2.) The dismissal of the underlying litigation is currently on appeal. (Dkt. No. 200, Declaration of Genster at ¶ 3.) The County seeks reimbursement of defense costs incurred in the now-dismissed lawsuits, along with defense costs that will be incurred during the appeal and (should the appeal be successful) in defending against future proceedings.

### III. Discussion

A. Legal standards

Summary judgment is proper "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 55 (1986).

The moving party is only required to assert that the party with the burden of proof cannot carry that burden, and "that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. On those issues where it bears the burden of proof, the non-moving party must present actual evidence to successfully oppose the motion and may not rest on allegations, speculations or opinion. *Anderson*, 477 U.S. at 248.

Both parties seek summary judgment on the controlling issue: whether Defendant breached its contractual duty to defend. There is an abundance of law in Washington concerning a liability insurer's duty to defend. The duty to defend is triggered in any action concerning allegations that are "conceivably covered" under the policy. *Woo v. Fireman's Fund Ins. Co.*, 161 Wn.2d 43, 53 (2007).[5] "[A]ny reasonable interpretation" of the policy that invokes coverage for the insured will control the question of whether a duty to defend has arisen, and the insured is entitled to the benefit of any uncertainty, whether legal or factual. *Am. Best Food v. Alea London, Ltd.,* 168 Wn.2d 398, 405 (2010). "Exclusionary clauses are narrowly construed for the purpose of providing maximum coverage for the insured." *George v. Farmers Ins. Co.*, 106 Wn. App. 430, 439 (2001).

The determinative legal issues fall into three categories:

(1) Was there a "tender" of claims to ICSOP such that its duty to investigate and defend was activated?

(2) Do the claims against the County fall into one or more of the "exclusions" in ICSOP's Policies such that the claims were not covered and thus the insurer was not contractually obligated to defend?

---

[5] The Court emphasizes that the findings which follow relative to ICSOP's "duty to defend" are based entirely on the standard enunciated in *Woo* that coverage need only be "conceivable" in order to trigger the duty to defend. Nothing in this order should be read to constitute a dispositive ruling on the issues of coverage under the ICSOP policies; it is not only unnecessary but – in view of the pending appeals in the Underlying Litigation – it would be inappropriate.

(3) Did the County exhaust its self-insured retention limits such that ICSOP's duty to defend was activated?

The Court will analyze each of these issues in order.

### 1. *Tender of claims*[6]

The issue here is whether the County "tendered" its claims to ICSOP in such a fashion as to trigger the insurer's duty to investigate and defend under the policies. The rule in Washington is clear: "[A]n insurer's duty to defend does not arise unless the insured specifically asks the insurer to undertake the defense of the action… [A]n insurer cannot be expected to anticipate when or if an insured will make a claim for coverage; the insured must affirmatively inform the insurer that its participation is desired." *Unigard Ins. Co. v. Leven*, 97 Wn.App. 417, 426-27 (1999). The *Leven* court made it clear that prior cases holding that putting an insurer on notice of claim was sufficient to constitute a tender of defense were disavowed. *Id.*

### a. *2014-2015*[7]

In its moving papers, the County adduced as proof of tender a series of 2014-2015 emails from representatives of the County to its various insurers. (Dkt. No. 199, Declaration of Day, Exs. 1-3.) Two of the emails specifically state "Please consider this email as a formal claim notice *and tender*." (*Id.*, Exs 1-2, concerning *Pszonka* and *Ward*; emphasis supplied.) The third email (which

---

[6] ICSOP filed motions to strike in conjunction with the briefing on the issues of "tender" and "exhaustion." They will be addressed in the body of the order as part of the analysis of those issues.

[7] In its Response Brief to ICSOP's motion (and again in its reply briefing on its own motion), the County essentially withdraws this portion of its argument and proof, "conceding" that no tender occurred until 2016. Without being privy to whatever strategic considerations motivated that decision, it is the Court's intention to consider all the evidence and argument that has been propounded, including this portion. It has been adequately briefed on both sides and, in the Court's opinion, is relevant to the analysis and ruling on this issue.

concerns both *Lester* and *Regelbrugge*) states "Please accept this email as Notice of Claim on behalf of Snohomish County." (*Id.*, Ex. 3.)

ICSOP moves to strike this evidence on grounds which are far from clear.  The insurer frames its objection as follows:

> Mr. Day simply authenticated the e-mails that are attached as Exhibits 1-4, but did not declare under penalty of perjury that the County ever tendered a complaint <u>and</u> requested ICSOP's participation. [*citation omitted*]  Moreover, even if the unsworn, out-of-court statements in Exhibits 1-4 could be construed to "tender" a complaint to ICSOP, they would constitute inadmissible hearsay.

(ICSOP Response at 3; emphasis in original.)

In the first place, whether a complaint has been satisfactorily "tendered" is a mixed question of fact and law.  Had the declarant sworn under penalty of perjury that the County had properly tendered the complaints, the Court would unquestionably be facing an objection from ICSOP that the County was submitting conclusory legal opinions as evidence.  Furthermore, it is unclear in what way the emails introduced as evidence by the County constitute "hearsay" for these purposes.  The emails are solely evidence that communications were transmitted to ICSOP using certain language; the question of whether the language is adequate to legally constitute a tender of defense is open and disputed, but the Court does not find the evidentiary objections to their introduction to be well-taken.

Moving on to a substantive analysis of the 2014-2015 County requests, the Court notes ICSOP's argument that the communications do not explicitly and "affirmatively inform the insurer that its participation is desired." *Leven*, 97 Wn.App. at 427.  The Court finds no requirement in the case law – and Defendants have cited to none – that the language "I, the insured, request that you, the insurer, undertake defense of this claim" must appear in a communication in order for a tender of defense to be effective.   In fact, a survey of Washington

law on the topic reveals no post-*Leven* case holding that particular words or phrases are required to create a "tender." *Leven* was decided 18 years ago and is well-enshrined in precedent and practice. All the parties to this transaction are sophisticated and experienced entities in the world of insurance.

The concept of "tender" merely connotes a certain form of notice from an insured to its insurer, communicating its belief that the insurer's obligations of coverage and defense have been triggered by an event or series of events and inviting the insurer's participation. The mechanism by which that is accomplished need not be complicated nor overly formal. The Court finds that the simple use of the word "tender" in a communication to an insurance company is sufficient to put that company on notice that it is being affirmatively informed that its participation in the defense of the claims is desired.

Two of the three emails (related to the *Pzsonka* and *Ward* cases) produced by the County as evidence of tendering their claims to ICSOP contain the phrase "formal… tender." The third email (related to the *Lester* and *Regelbrugge* cases) simply states "Please accept this email as Notice of Claim on behalf of Snohomish County" – exactly the language which the Washington cases have held does *not* constitute a tender sufficient to activate an insurer's duty to defend. On that basis, the *Pzsonka* and *Ward* emails successfully constitute a tender of the County's claim for defense; the *Lester/Regelbrugge* email, by its language alone, does not.

However, as the *Leven* court also pointed out, the "tender" inquiry does not end with an examination of whether or not the insured has satisfied the terms of its contract by affirmatively notifying an insurer that the insurance company's participation in the insured's defense is desired.

[E]ven when an insured breaches an insurance contract [by failing to adequately "tender" its request for defense], the insurer is not relieved of its duty to defend unless it can prove that the late notice resulted in actual and substantial prejudice. To demonstrate actual prejudice, the insurer must demonstrate some concrete detriment, some specific advantage

lost or disadvantage created, which has an identifiable prejudicial effect on the insurer's ability to evaluate, prepare or present its defenses to coverage or liability.

*Leven*, 97 Wn.App at 427. Nowhere in its briefing in either of these dispositive cross-motions does ICSOP make the claim (let alone an offer of proof) that the County's initial failure to properly tender defense of the *Lester* or *Regelbrugge* lawsuits to the insurance company, or any delay in tender, has prejudiced it in the manner required by *Leven*.

Furthermore, there is evidence from the insurer itself that, at some point in 2014-2015, ICSOP was on notice that it had been invited to participate in the defense of the County from the underlying lawsuits. This evidence derives from a series of letters which ICSOP sent to the County in 2014 and 2015 in response to being notified by the County of the various lawsuits filed against it in conjunction with the Oso landslide. (*See* Dkt. No. 201, Declaration of Cordell, Exs. K-N.) Every one of those letters contained a section entitled "Defense" with a subsection devoted to "ICSOP First Layer Special Excess Liability Policy," and every one expressed the opinion of ICSOP's agent that inadequate proof of exhaustion of underlying insurance and/or self-insured retention had been provided. In the course of communicating that opinion, each letter also advised "**There is no duty to defend or investigate any claim or suit until such exhaustion.**" (Emphasis in originals.)

Based on the Court's understanding that "tender of defense" denotes nothing more than a communication by insured of its belief that an insurer's duty to defend has been activated, the Court finds it beyond question – from ICSOP's own responses to the County – that the insurer was fully aware of the existence of the complaints in the underlying litigation, of the County's belief that ICSOP's duty to defend had been triggered by the underlying lawsuits, and of the County's desire that ICSOP participate in that manner. The duty to defend under ICSOP's policy had been

1  "tendered." Whether that duty actually existed under the language of the contracts is a completely

2  different inquiry, and will be analyzed later in this order.

3                    b. *2016*

4        The County presented evidence to support its position that tender of defense had, at the

5  very least, occurred in 2016. ICSOP objected to that evidence, moving to strike it, and additionally

6  interposed substantive arguments as to why defense of the County's claims could not have been

7  tendered in 2016. Having found sufficient evidence of tender *supra*, the Court finds it unnecessary

8  to consider the parties' evidence and argument concerning the 2016 documents adduced as further

9  proof of tender. Because the defense of the *Pzsonka* and *Ward* complaints was properly tendered

10 prior to the filing of the County's complaint and because ICSOP has presented no evidence that it

11 has been prejudiced by the defective and/or delayed tender of the *Lester* and *Regelbrugge*

12 complaints, the Court resolves the initial "tender" argument in favor of the County and moves on

13 to consideration of other issues regarding tender raised by ICSOP.

14                    c. *Amended complaints*

15       The parties are in agreement that, following the initial filing of the lawsuits, amended

16 complaints were filed in the underlying litigation. ICSOP claims that defense of these amended

17 complaints was never tendered to the company and, on that basis, the insurer is not obligated by

18 any duty to defend.

19       It is not a meritorious position. In the first place, ICSOP cites no case law holding that,

20 once an insured tenders defense on a claim (as the Court finds the County did regarding the

21 underlying lawsuits here), that party is required to *re*-tender the defense every time the complaint

22 is amended. While ICSOP alleges that new plaintiffs were added in the amended complaints, it

23 fails to explain how it was prejudiced by that fact or how that changed in any substantive way its

24

contractual obligation to defend its insureds (if such duty existed at all) such that re-tendering was required.

Furthermore, there is evidence that the County made the information regarding the amended complaints available to ICSOP in an ongoing and timely manner. ICSOP was provided with a "ShareFile" link which was utilized by the County's counsel to regularly upload all new filings and pleadings related to the underlying litigation (including all amended complaints). (Dkt. No. 211, Declaration of Beard, ¶¶ 2-4.) In its summary judgment motion and supporting declaration, ICSOP takes the position that it was unable to access the data available through this link. (Dkt. No. 202, ICSOP Motion at 14; Dkt. No. 203, Declaration of Beard, ¶ 30.) This assertion is directly contradicted by the insurer's communications with the County. In a letter dated September 12, 2016, Daniel Broker ("Complex Director" of ICSOP parent company AIG) advised the County that, "[b]ecause the County has failed to identify any… documents [establishing coverage for the loss under any of its ICSOP policies], *I have not reviewed any documents you may have uploaded to the ShareFile link*." (Dkt. No. 201-4, Declaration of Cordell, Ex. J; emphasis supplied.) Nor does ICSOP provide any further evidence establishing that they ever informed the County that the company was unable to access the data provided via the ShareFile link (as opposed to simply ignoring it). If ICSOP had the ability and the means to access the amended complaints which the County asserts it uploaded to that site, but never availed itself of that opportunity, the fault lies with itself.

Furthermore, the County asserts that it held regular telephone conferences (at first semi-monthly, then monthly) to update representatives of ICSOP and the other insurers on the developments in the underlying litigation. "During these telephone conferences… the County provided pertinent information to all insurer representatives that participated, including informing

them of underlying plaintiffs' amended complaints." (Dkt. No. 213, Supplemental Declaration of Genster, ¶ 2.)  If ICSOP was unaware of the existence of the amended complaints, it was not through inaction on the County's part.

The County did not need to "re-tender" the amended complaints.  Having been tendered the defense of the original complaints and been given access to updated information regarding the progress of the underlying litigation, ICSOP will be charged with knowledge that the County invited their participation in defense of the amended complaints as well.

### d.  *Providing documentation*

In both the briefing on its own motion and its responsive briefing to the County's motion, ICSOP takes the position that "Washington's tender requirements also require an insured to provide the insurer with the information that it needs to evaluate the request."  (Dkt. No. 219, ICSOP's Reply Brief at 3; *see also* Dkt. No. 206, ICSOP's Response Brief at 16.)  The argument appears to be that somehow a tender is "incomplete" if it is not accompanied by documentation establishing that a claim has been made; and, additionally, in the case of an "excess" insurer, ICSOP contends that the insured "must necessarily produce… information and evidence sufficient to demonstrate that the insured has fully and validly <u>exhausted</u> its underlying insurance." (ICSOP's Reply at 3; emphasis in original.)

Tellingly, ICSOP cites to no authority for this proposition, maintaining instead that the Washington cases "*implicitly* require[] an insured to produce with any 'tender' the documents and information that the insurer needs to evaluate the insured's request."  (ICSOP's Response at 16; emphasis supplied.)  In reviewing the Washington cases, the Court finds no such implication.  The seminal *Leven* case (cited repeatedly by ICSOP) simply states that "the insured must affirmatively inform the insurer that its participation is desired."  *Leven*, 97 Wn.App. at 426-27.  The Court has

not found – nor has ICSOP cited to – any cases which hold that a tender of defense failed because "documents and information" were not provided.

The Court rejects this additional burden that ICSOP would place on a "tender of defense" and reiterates its position that a "tender" of defense is nothing more than notice and an invitation to participate based on an insured's belief that an insurer's duty to defend has been activated by events covered by their insurance contract. Before that duty to defend is affirmatively established, there must of course be an exchange of information sufficient to permit a thorough investigation and determination of whether the insurance contract requires the insurer's participation – "tender" is simply an advisement that the insured, believes the insurer's duty has been triggered.

e. *"Exhaustion" of self-insured retention/underlying insurance*

ICSOP argues that the County has failed to prove "exhaustion" of either its self-insured retention or any underlying insurance and, therefore, no "tender" of defense occurred. This argument suffers from the same defect outlined above. The Court agrees that, before ICSOP can be determined to have been under a duty to defend, or found liable for failing to fulfill that duty, an "exhaustion" determination must be reached. But the point at which to do that is not the preliminary analysis of whether a tender of defense was made; "exhaustion" is not a "tender" issue.


In summary, regarding "tender": For the *Pzsonka* and *Ward* suits, the County's communication with its insurer of the existence of the initial complaints coupled with notice of "formal tender" suffices to tender their defense. For the *Lester* and *Regelbrugge* suits, the "tender" (which consisted of a "Notice of Claim"), although defective, was not ineffective – ICSOP demonstrated awareness of the tender of defense in its written responses to the County and has failed to demonstrate any prejudice resulting from the defective or delayed notices of tender.

Tender of defense having been made for the initial complaints, there is no requirement that a separate tender be made for any amended complaints, as the County provided ICSOP with notice and the means for keeping advised of any such developments in the underlying litigation. There is no requirement that tender of defense consist of anything more than notice that the insured desires the insurer's participation in the defense of its claims; failure to append documentation or other information regarding the existence of the claims or the "exhaustion" of self-insured retention or underlying insurance will not invalidate an otherwise effective tender.

### 2. *Policy restrictions and exclusions*

There are number of policy restrictions and exclusions which, ICSOP argues, preclude coverage and justify its decision not to participate in the defense of the County in the underlying litigation. A provision-by-provision analysis follows.[10] The Court reiterates that this analysis is guided by the *Woo* standard that a claim need only be "conceivably covered" to trigger the duty to defend.

### a. *Errors and Omissions – wrongful acts during policy periods*

The ICSOP policies included an Errors and Omissions ("E&O") Liability section which stated:

### 2. ERRORS AND OMISSIONS LIABILITY

---

[10] ICSOP argues that the County is not entitled to coverage under the Bodily Injury/Property Damage insuring agreement. Since the County agrees with this position (*see* County's Response at 12), the Court will not analyze this argument. As to the legal impact of the fact that there may be both covered and non-covered claims in the underlying litigation, the Court will be guided by the holding that "[n]o right of allocation exists for the defense of non-covered claims that are 'reasonably related' to the defense of covered claims. *See Federal Realty Inv. Trust v. Pacific Ins. Co.*, 760 F. Supp. 533, 536-537 (D. Md. 1991) (holding that an insurance company is not entitled to allocation of defense costs when legal services benefitted the defense of both covered and non-covered claims)[.]" *Nordstrom, Inc. v. Chubb & Son*, 820 F. Supp. 530, 536 (W.D. Wash. 1992).

> We shall pay you, or on your behalf, the ultimate net loss, in excess of the retained limit, that the insured becomes legally obligated to pay to compensate others for loss arising out of your *wrongful act that takes place during the Policy Period* and arises solely in performing or failing to perform duties of the public entity.

*See, e.g.,* Decl. of Broker, Ex. 5, pp. 8, 10, 13, 14, 16, 20 (emphasis supplied).

ICSOP asserts (and the County does not disagree) that it is the County's burden to demonstrate that the underlying lawsuits allege wrongful acts that fell within the scope of the policy periods covered by ICSOP's agreements. ICSOP cites to a September 26, 2016 letter from counsel for the County which cites allegations from the *Lester* and *Pzsonka* suits which had occurred during the ICSOP policy periods. (Decl. of Broker, Ex. 24.) The insurer then goes on to argue that the failure to cite to any similar allegations from the *Ward* or *Regelbrugge* lawsuits meant that the County did "<u>not</u> maintain that the plaintiffs in the *Ward* or *Regelbrugge* suit have alleged any wrongful acts during the policy periods of the ICSOP policies." (ICSOP Motion at 22; emphasis in original.)

The County characterizes this as a "misreading" of the September 2016 letter, contending that it only cited "*examples* from various complaints to demonstrate that each complaint in the consolidated underlying action alleged 'wrongful acts.'" (County Response at 15; emphasis in original.) The County's responsive pleading to ICSOP's motion contains a table illustrating that every one of the complaints in the underlying lawsuits contained allegations of "wrongful acts" during ICSOP policy periods. (*Id.* at 13-14.) It is clear that, had the insurer availed itself of the opportunity to review the complaints at the ShareFile link provided by the County or participated in the regularly-scheduled conference calls updating the status of the underlying litigation, it would have been aware that allegations of "wrongful acts" during ICSOP policy periods were present in every complaint filed against its insured.

Based on its "duty to investigate,"[11] the insurer is charged with that knowledge. Indeed, in its reply brief, ICSOP appears to abandon this argument in favor of arguing that an E&O exclusion "for bodily injury or property damage arising out of a wrongful act"– discussed *infra* – invalidates the claims for which the County is seeking defense.

### b. *Exclusion A – "bodily injury" and loss of consortium*

Section V, the "Exclusions" section of the ICSOP insurance contracts, contains the following provision:

> We will not defend or pay under this Policy for claims or suits against you:
>
> A. For bodily injury or property damage arising out of a wrongful act… whether causing or contributing to such bodily injury or property damage.

*See, e.g.,* Decl. of Broker at Ex. 5, pp. 8, 10, 13, 14, 16, 20. As mentioned earlier *(see* fn. 9 *supra* and County's Response at 12), the County has conceded that none of the claims against it in the underlying litigation for bodily injury or property damage are covered by its ICSOP policies; the only arguably-covered claims these parties are disputing are for loss of consortium.

ICSOP seeks to extend that exclusion to cover the claims against the County for loss of consortium. The insurer contends that the loss of consortium claims "derive" from the claims for wrongful death and/or bodily injury, a position it defends by citing the language of the underlying complaints and the language of its own policies, as well as Washington case law.

ICSOP first maintains that the language of the underlying complaints dictates a finding that the loss of consortium claims are derived from the wrongful death/bodily injury claims and

---

[11] ICSOP not only had a contractual duty to investigate (*see, e.g.,* Dkt. No. 201, Declaration of Cordell, Ex. F at 8-9), but Washington case law is clear regarding the "contractual and statutory obligation to fully and fairly investigate a claim." *Coventry v. American States Ins. Co.*, 136 Wn.2d 269, 279 (1998). "An insurer is charged with the knowledge which it would have obtained had it pursued a reasonably diligent inquiry." *Bosko v. Pitts & Still*, 75 Wn.2d 856, 864 (1969).

therefore fall under Exclusion A.  ICSOP examines all the complaints in the underlying litigation and points out that the claims for loss of consortium are found in those sections of the pleadings which concern the personal injury and death which resulted from the Oso landslide.  (*See* Dkt. No. 206, Defendant's Response at 20-21; Dkt. No. 219, Defendant's Reply at 8-10.)  The Court finds nothing remarkable in this: there is no question that, without some form of death or bodily injury, there is no cause of action for loss of consortium.

The question is whether the cause of action falls under the *language* of ICSOP's policy excluding claims "[f]or bodily injury… arising out of a wrongful act."  The language of Exclusion A itself would seem to indicate otherwise: whatever a loss of consortium claim is, it is *not* a claim *for* bodily injury.  One could say that it is a claim which derives *from* bodily injury (to another person), but that is not how the ICSOP policies' exclusion reads.

ICSOP argues, however, that the definition of "bodily injury" in its policies does include loss of consortium.  The definition of "bodily injury" reads:

> [B]odily harm, sickness, disability or disease.  Bodily injury shall also mean mental injury, mental anguish, humiliation, shock or death if resulting directly from the bodily injury, sickness, disability or disease.  *Bodily injury shall include care and loss of services resulting at any time resulting [sic] from the bodily injury of any person* or persons.

(Dkt. No. 201-3, Decl. of Cordell, Ex. F at 10; emphasis supplied.)  Interestingly, while ICSOP emphasizes the "care and loss of services" language when it quotes this provision in its briefing, the insurer never actually makes the argument that "'care and loss of services' equals 'loss of consortium'" and thus qualifies as "bodily injury" under the policy.  Such an argument would carry little weight.  The concept of "loss of consortium" extends far beyond "care and loss of services."  As the Washington Pattern Jury Instructions reflect, loss of consortium "includes emotional support, love, affection, care, services, companionship, including sexual companionship, as well as assistance from [one spouse][one domestic partner] to the other." (Wash. Pattern Jury Instr. Civ.

32.04 (6th ed.).)  "Although loss of consortium includes loss of services and loss of society as components, that does not make the concepts interchangeable."  *Thorn v. Mercy Memorial Hosp. Corp.,* 281 Mich.App. 644, 662 (2008).

ICSOP cites a number of Washington cases in an attempt to bolster its argument that state courts have held loss of consortium claims to be "derivative" of bodily injury claims.  They are all distinguishable from the instant matter.  *Thompson v. Grange Ins. Assoc.* (34 Wn.App. 151, 161 (1983)) is cited by ICSOP for its language that

> damages for loss of consortium are consequential, rather than direct, damages.  They necessarily are dependent upon a bodily injury to the spouse who can no longer perform the spousal functions…

But, as has been observed *supra*, to say that loss of consortium damages "are dependent upon a bodily injury" is not the same thing as saying that the cause of action is "derivative" of a bodily injury claim – indeed, the *Thompson* case was concerned with the liability cap on a policy which limited "the company's liability for all damages *because of* bodily injury sustained by one person" to $30,000.  (*Id.* at 162; emphasis supplied.)  Again: an exclusion for "all damages *because of* bodily injury" is not the same thing as an exclusion for "damages *for* bodily injury."

ICSOP invites this Court to equate language like "consequential" and "because of bodily injury" with a finding that "loss of consortium allegations… thus constitute claims 'for bodily injury' under an insurance policy."  (ICSOP Response at 23.)  It is too simplistic and reductive.  What is clear from the cases is that "derivative" means different things in different contexts, and to argue that a loss of consortium claim is "derivative" from a claim for bodily injury or death in one case because it was found to be so in another case is not a helpful use of precedent.  A review

of the cases reveals that there is no overarching legal theory holding that, in all circumstances, a cause of action for loss of consortium is the same as a claim for bodily injury or death.

The use of the word "derivative" is little more than legal shorthand for a conclusion which can only been reached on a case-by-case basis, examining the language of the policy, the factual circumstances and the legal context to determine whether the consortium claim "derives" from the injury claim for purposes of that case. In this case, neither the language of the ICSOP policies nor the facts regarding the pleading of loss of consortium in the underlying litigation are in dispute; it is the legal outcome of those facts that is disputed.

Another one of ICSOP's supporting cases, *Grange Ins. Assoc. v. Hubbard* (35 Wn.App. 407 (1983)), involved policy limits for injuries for "bodily injury sustained by one person" and whether the insurer should pay on a parent's loss of consortium claim beyond the maximum amount already paid out for the death of the parent's child. (*Id.* at 412.) The *Hubbard* court was not concerned with whether the policy excluded coverage for loss of consortium claims at all, merely whether it was a separate claim for which a new policy limit should apply. There is no question, under the language of the opinion, that had the policy limits not been reached in covering other parts of the claim, the parent would have been compensated under the policy for the loss of consortium with her child. The *Hubbard* court's analysis does not assist this Court in analyzing this particular issue.

Even less helpful is ICSOP's citation to *Eurick v. Pemco Ins. Co.* (108 Wn.2d 338 (1987)), a case in which the Washington Supreme Court declared that the question of whether the loss of consortium claim "should be characterized as 'derivative' or 'nonderivative' need not concern us here." It is purely a case involving construction of an insurance contract and "whether a reasonable person reading the insurance policy would believe that the motorcycle exclusion applied to the

parents' [loss of consortium] claims." Since the *Eurick* court read the contract to exclude "*all* claims arising from injuries sustained by a motorcycle driver or rider," the loss of consortium claim was disallowed. (*Id.* at 341-42; emphasis in original.)

ICSOP does cite one case wherein a loss of consortium claim was disallowed as falling under damages for "loss of services." The Ninth Circuit favorably cited a California case which held that "[l]oss of consortium is not only similar in kind to damage for loss of services… but actually includes loss of services as one of its elements." *Nationwide Mut. Ins. Co. v. Kuehling*, 1988 U.S. App. LEXIS 21470 at *6-7 (*quoting United Service Auto. Assoc. v. Warner*, 64 Cal.App.3d 957, 962 (1976); *citations omitted*). But this Court notes that the case, in addition to being unpublished (and therefore of no value as controlling Ninth Circuit precedent), has not been cited by another court in the nearly 30 years since it was decided. Its logic has no appeal here and the Court declines to view it as precedent.

If ICSOP specifically wanted to include loss of consortium in its exclusionary definition of "bodily injury," it certainly knew how to do so. To the extent that Exclusion A is ambiguous as to whether it includes loss of consortium, that ambiguity will be interpreted to favor coverage, as is the rule of construction in Washington, where '[t]he rule strictly construing ambiguities in favor of the insured applies with added force to exclusionary clauses which seek to limit policy coverage. Exclusions of coverage will not be extended beyond their 'clear and unequivocal' meaning." *Am. Star Ins. Co. v. Grice*, 121 Wn.2d 869, 875 (1993). The Court finds that it is far from "clear and unequivocal" that Exclusion A includes loss of consortium; that ambiguity will be resolved in the County's favor.

In summary: the loss of consortium claims at issue in the underlying litigation are not excluded under the ICSOP policies because they are neither claims *for* bodily injury, nor do they

fit under the "loss of care and services" portion of "bodily injury" as defined by the policy language.  To the extent that there is some ambiguity on this issue, the Court resolves that ambiguity in favor of the insured and against the drafter of this exclusionary provision.

c.  *Exclusion X – "land subsidence"*

The language of this exclusion reads that ICSOP "will not defend or pay under this policy for claims or suits against you… [f]or any property damage arising out of land subsidence for any reason whatsoever."  (*See, e.g.,* Dkt. No. 201-3 at 24.)  "Land subsidence" is clearly defined to include "the movement of land or earth, including, but not limited to… landslide[s]…" (*Id.* at 12.)  The County makes a half-hearted stab at characterizing this as an ambiguous provision as regards "man-made" causes of landslides, but the Court agrees with ICSOP: the policy language "for any reason *whatsoever*" removes any issue of ambiguity.

In the final analysis, however, the Court is confused as to why there is any controversy over this provision.  As has been established *supra*, property damage arising from wrongful acts is clearly excluded from coverage under the ICSOP policies. The plaintiffs in the underlying lawsuits sued the County because they believed that the County bore some responsibility for the fact that the landslide damaged their property; i.e., that some "wrongful act" by the County contributed to the damage wrought by the disaster.  The County concedes that the underlying lawsuits allege "wrongful acts" against it and concedes that the E&O provisions of their insurance are inapplicable to any claims for bodily injury or property damage alleged to have occurred because of Plaintiff's "wrongful acts."  So the fight over this further exclusion against property damage claims appears somewhat pointless.

d.  *Exclusion Z – "failure of any dam"*

The exclusionary language of this provision advises the insured that ICSOP "will not defend or pay under this Policy for claims or suits against you… arising out of the… partial or complete failure of any dam." (*See, e.g.,* Dkt. No. 201-3 at 24.) The policies define "dam" to mean "any artificial barrier, together with appurtenant works, which does or may impound or divert water." (*Id.* at 10.)

ICSOP alleges that this exclusion applies to the *Regelbrugge* suit, wherein the plaintiffs alleged that the failure of a "woody cribwall" caused the Oso landslide. (*See* Dkt. No. 201-1 at 72-74, 75, 79, and 90-92.) The insurer maintains that the "woody cribwall" qualifies as a "dam" under the policy definition, because it was constructed "to divert the river from the toe of the landslide and prevent the river from removing materials from the toe of the landslide and destabilizing the landslide." (ICSOP Response at 24.)

In an effort to defeat this argument, the County reproduced a picture of the cribwall in its responsive briefing to ICSOP's motion, citing as support for its introduction of the picture language from a Washington Supreme Court opinion that "the duty to defend may be triggered by information outside of the complaint," and "facts outside the complaint may be considered" when the allegations of the complaint are "ambiguous or inadequate." *Woo v. Fireman's Fund Ins. Co.,* 161 Wn.2d 43, 54 (2007). ICSOP objects to the use of this evidence on the grounds that the County has not "establish[ed] that ICSOP knew of facts and/or could have readily ascertained facts establishing that the crib wall was not a dam." (ICSOP Reply at 14.) But that is not the test under *Woo* – the insurer's duty to investigate further and consider facts outside the complaint is triggered if the allegations of the complaint are "ambiguous or inadequate."

The description of the "woody cribwall" found in the *Regelbrugge* complaint does not suggest the "impounding" or "diverting" of water.[13]   In fact, a reasonable person reading that language would assume that the purpose of the wall was to keep the land comprising the shore from falling into the river.  The Court finds that the "woody cribwall" is not a "dam" as that term is defined in Exclusion Z.

Because of this finding, the Court need not and does not reach the issue of whether the "failure" of the woody cribwall "caused" the landslide, an allegation which the County naturally contests and which is still an open question as long as the underlying lawsuits remain on appeal.

### e.   *Exclusion O – "dishonest acts"*

Exclusion O of the ICSOP policies provides that the insurer "will not defend or pay under this Policy for any claims or suits against you… [a]rising out of a[]… dishonest [or] fraudulent act." (*See, e.g.*, Dkt. No. 201-3 at 23.)  While ICSOP does not contend that the County was alleged to have committed fraud in connection with the landslide, the Defendant points to allegations in all the underlying lawsuits that the County "misled" or "falsely reassured" local citizens regarding the possible occurrence of the disaster, knowing that the cribwall would not protect against future landslides (*see* ICSOP Response at 26-27) and argues that such claims, even when couched in terms of negligence, "arise out of" dishonest or fraudulent acts and thus fall under the exclusion.

The Court agrees with the County that this exclusion is intended to address crimes or acts of willful dishonesty or fraud, none of which are alleged here.  The insurer cites no definition of the terms "dishonest" and "fraudulent" from the policies which would support its interpretation and any ambiguity regarding what those terms mean will be construed in the insured's favor.  The

---

[13] From the *Regelbrugge* complaint: "The purpose of this project is to isolate the North Fork Stillaguamish River (NFS from the Steelhead Haven landslide (SHL)… to prevent the river from transporting fine sediments downstream… [to] dramatically reduce fine sediment input into the river… Without this project the river will transport the landslide materials downstream…"  (Dkt. No. 201-1 at 73; *Regelbrugge* complaint at ¶ 3.42.)

case which ICSOP cites for the proposition that an act or omission can be "dishonest" or "fraudulent" even when presented in a negligence cause of action (*Stouffer & Knight v. Continental Cas. Co.*, 96 wn.App. 741, 751, n.13 (1999)) is easily distinguished from these facts – in *Stouffer,* the "fraud" was attributed to a dishonest employee while the "negligence" referred to the employer's supervision of that employee, a situation which resembles the facts before this Court not in the least.

The County's claims remain "conceivably covered" despite the existence of Exclusion O and ICSOP is not excused from its duty to defend on this basis.

3. *Exhaustion of self-insured retention*

The ICSOP policies state the following in relation to the limits of the insurance which ICSOP provides and the "retained limit" for which the County was responsible:

SECTION III.                LIMITS OF INSURANCE

A. The Limits of Insurance shown in the Declarations and the rules below state the most we will pay in excess of your retained limit…

B. The retained limit shown in the Declarations applies:

   1. Only to damages for occurrences [or] losses for wrongful acts… covered by this Policy; and
   2. Separately to each occurrence, wrongful act,… or series of continuous, repeated, or related occurrences [or] wrongful acts.
      *       *       *       *

C. Our duty to pay any sums that you become legally obligated to pay arises only after there has been a complete expenditure of your retained limit by means of payments for judgments, settlements, or defense costs.  Your retained limit shall not be exhausted by your office expenses, employees' salaries, or expenses of any claims servicing organization that you have engaged.

D. If the limits of underlying insurance [$0] are less than your retained limit [$1 million or $1.5 million], you shall bear the risk of the difference.
      *       *       *       *

H.  The Limits of Insurance apply separately to each consecutive annual period.

(*See, e.g.,* Decl. of Broker, Ex. 5 at 4, 8, 17-19.)

ICSOP contends that the County has failed to establish "exhaustion" of its "retained limit" (a/k/a "self-insured retention" or "SIR") – per Section III.C – and thus had no right to expect defense or coverage from the insurer.  ICSOP's arguments on those points are both substantive and evidentiary, and the Court will discuss them separately.

a.  *Exhaustion of the County's SIR – substantive objections*

ICSOP's first argument – that whether or not the County has exhausted its SIR is irrelevant because there is no coverage under the ICSOP policies – will be dispensed with swiftly.  As has been demonstrated *supra*, the Court finds that coverage for the underlying lawsuits was at least "*conceivably* available" (*see* n. 3 *supra*) to the County through the policies at issue, and ICSOP's argument to the contrary is unavailing.  Thus, whether or not the County had exhausted its SIR such that it had a right to call upon its insurer for defense is extremely relevant.

ICSOP's first argument related to the exhaustion of the SIR itself maintains that the County is required to prove that it paid the SIR limit out of its own funds.  (ICSOP Motion at 30.)  It is a puzzling position-- the insurer cites neither to language in its policy that contains such a requirement or to case law that dictates such a condition as a matter of public policy.  The Court can find none, and rejects the argument.

ICSOP next contends that the County was required to prove that it had expended its SIR relative to this policy *independently* of any SIR it exhausted under any other policy (with reference specifically to the SIR under the County's policy with Starr Indemnity & Liability Co.); i.e., that the County pay a "fresh" $1.5 million or $1 million (depending on the policy period) to satisfy the ICSOP SIR.  (*Id.*)  The insurer's position is that "the County's payment to exhaust the self-insured

retention under Starr's policy could not also exhaust a self-insured retention under the ICSOP policy." (*Id.*)

Again, there is nothing in the policies reflecting such a requirement, and case law in Washington holds otherwise. Addressing a similar argument, the Washington Court of Appeals has held

> [The policy] says nothing about whether or not [Plaintiff's] obligation to pay the [] SIR is satisfied when it fulfills a similar obligation under another policy. It is also clear that the defense costs [Plaintiff] paid were necessarily related to damages covered by both… policies. "No right of allocation exists for the defense of non-covered claims that are 'reasonably related' to the defense of covered claims." [*citations omitted*] Therefore [the insurance company] has no right to apportion defense costs between the two policies."

*Bordeaux, Inc. v. Am Safety Ins. Co.,* 145 Wn.App. 687, 698 (2008).

ICSOP also argues that, because "each ICSOP Policy's self-insured retention applies 'separately to each wrongful act,'" the County is responsible for a separate SIR for each of the wrongful acts alleged in each of the complaints filed in the underlying lawsuits. (ICSOP Motion at 30-31.) The insurer is selectively reading its own policy – as can clearly be seen from the policy language quoted *supra*, the SIR applies "[s]eparately to each occurrence, wrongful act,… or *series of continuous, repeated, or related occurrences [or] wrongful acts*." (Decl. of Broker, Ex. 5 at 19; emphasis supplied.) Even understanding that the underlying lawsuits allege multiple acts which their plaintiffs believe contributed to the damages they suffered, the Court finds that all the allegations are directly connected to (and lead up to) the central activating event of the Oso landslide and the County's efforts to prevent it, and as such qualify as a "series of continuous, repeated, or related occurrences [or] wrongful acts" which can be satisfied by the payment of a single SIR.

ICSOP's final substantive "exhaustion" argument concerns Section III.H of its policies. While the insurer believes that this provision, which states that "[t]he Limits of Insurance apply separately to each consecutive annual period" applies to the SIRs (the "retained limits")[14], the Court is unconvinced. "The Limits of Insurance" and "the retained limit" describe two entirely different things in ICSOP's policies; the former being "the most [ICSOP] will pay in excess of [the insured's] retained limit," the latter being the amount the insured must pay before the insurer is obligated to cover or defend. The fact that both phrases appear in "The Limits of Insurance" section of the policies does not mean that everything that is applicable to "[t]he Limits of Insurance" is applicable to "the retained limit."[15]

Substantively, the Court finds that ICSOP has failed to put forth a legal argument which sustains its position that the County has failed to fully and properly exhaust its self-insured retention. The Court turns next to the insurer's evidentiary objections that the County has not submitted admissible evidence of the exhaustion.

b. *Exhaustion of SIR – evidentiary objections*

ICSOP has interposed a number of objections to the evidence submitted by the County that the "exhaustion" requirement had indeed been met. While they are numerous, the Court fails to see their merit.

---

[14] In purporting to quote their own policy, ICSOP goes so far as to insert "the retained limit" into a policy provision where it does not appear: "H. The Limits of Insurance [*i.e., including the retained limit of insurance*] apply separately to each consecutive annual period." (ICSOP Motion at 29 and ICSOP Response at 28; emphasis supplied.)

[15] ICSOP's citation to *Polygon Northwest Co., LLC v. Steadfast Ins. Co.*, 682 F.Supp.2d 1231, 1233-37 (W.D.Wash. 2009), while inapposite, is instructive. The policy in that case contained similar language to that in ICSOP's policy – "The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period[.]" – which the *Polygon* court correctly observed "is obviously to the benefit of the insured." *Id.* at 1234. But that policy also contained a provision that "[t]he 'self-insured retention' amounts of this Coverage part apply separately to each consecutive annual period," (*id.* at 1233], precisely the language which ICSOP's policies do *not* have.

The County seeks to establish its evidence of exhaustion of the SIR through the Declaration of Joseph Genster. (Dkt. No. 200.) Genster avers that he is a Deputy Prosecuting Attorney in the Snohomish County Prosecuting Attorney Civil Division who represents the County in this litigation. He affirms that his declaration "is based upon personal knowledge and familiarity with the correspondence and other materials in this matter and the record in the lawsuits arisen out of the 2014 Oso Landslide." (*Id.* at ¶ 1.) Genster also declares:

> Following the Oso Landslide… the County was named as a defendant in four separate lawsuits ("Underlying Litigation"). The County has been defending the claims asserted in the Underlying Litigation. This has included such things as: (1) hiring outside counsel at Calfo Harrigan Leyh & Eakes LLP; (2) retaining numerous expert witnesses; (3) expending significant county prosecutor time on the defense; and (4) the County assigning me to the full time defense of the claims. The County has expended in excess of $4 million defending the Underlying Litigation.

(*Id.* at ¶ 2.)

ICSOP moves to strike this declaration as evidence. Defendant's first objection is that the declaration lacks specific facts upon which the Court can find Genster competent to testify or possessing sufficient personal knowledge to testify regarding the County's expenditures in the underlying lawsuits. The Court fails to see the basis for this objection: the declarant identifies himself as an attorney in the employ of the County, and an active representative not just in this litigation but in the "full time defense of the claims" asserted against the County in the underlying litigation. It is an adequate basis from which to reasonably infer that he has personal knowledge of the facts contained in his declaration.

The insurer's next objection, that Genster's declaration somehow contravenes Rule of Professional Conduct ("R.P.C.") 3.7, is completely meritless. While ICSOP objects to a declarant who is both an advocate and witness for a party, it is an entirely common practice for counsel to submit declarations in support of motions averring to facts related to the conduct of the case.

R.P.C. 3.7 is directed toward a prohibition against counsel appearing as witnesses for their clients *at trial*, and says nothing about the practice of submitting declarations as attachments to motions.

ICSOP further objects to what it describes as the "self-serving, uncorroborated" nature of the declaration. As to the "self-serving" quality of the declaration, the very case cited by the insurer makes the point quite eloquently:

> [D]eclarations oftentimes will be "self-serving" -- "[a]nd properly so, because otherwise there would be no point in [a party] submitting [them]." *United States v. Shumway*, 199 F.3d 1093, 1104 (9th Cir. 1999). In most cases, consequently, "[t]hat an affidavit is self-serving bears on its credibility, not on its cognizability for purposes of establishing a genuine issue of material fact." *Id*. Only in certain instances -- such as when a declaration "state[s] only conclusions, and not 'such facts as would be admissible in evidence,'" -- can a court disregard a self-serving declaration for purposes of summary judgment. *Id*. (quoting FED. R. CIV. P. 56(e)).

*Securities v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007).

ICSOP's objection to the "uncorroborated" nature of the declaration is directed at the fact that the County submitted no supporting documentation to Genster's declaration to confirm his representation that the County had spent "in excess of $4 million" in defending the underlying lawsuits. But the fact of the matter is that "corroboration" is not a requirement of the Federal Rules of Civil Procedure governing summary judgment. Fed.R.Civ.P. 56(c)(4), concerning "Affidavits or Declarations" in summary judgments, requires only that a declaration be made on personal knowledge, "set out facts that would be admissible in evidence, and show that the… declarant is competent to testify on the matters stated." Genster's declaration satisfies those criteria.

Nor is ICSOP's objection that Genster's declaration is "materially and fatally vague" well-taken. The objection to the use of the word "expend" borders on the frivolous. ICSOP claims that

the term is vague and ambiguous, as it is impossible to determine [1] <u>whether</u> any of the County's defense costs have actually been <u>paid</u>, [2] <u>by whom</u> any of the defense costs have actually been <u>paid</u>, [3] the amount, if any, that <u>the County</u> has actually paid, and/or [4] the <u>circumstances</u> under which the County has paid them.

(ICSOP Response at 9; emphasis in original.)  The word "expend" means "to pay out, spend,"[16] and leaves no question as to whether the costs "have actually been <u>paid.</u>"  The remainder of the insurer's objections to this term ("by whom" and – cryptically – "the circumstances") involve legal arguments which are irrelevant to an evidentiary ruling and have been addressed *supra*.  Similarly, ICSOP's contention that Genster's failure to specify *which* lawsuits he is referring to by his use of the term "Underlying Litigation" renders that phrase "fatally vague" is absurd.  It is abundantly clear from the briefing on both sides that all parties are aware of the four lawsuits which comprise the "Underlying Litigation" and it is disingenuous to claim otherwise.

ICSOP's final evidentiary objection is reserved for a series of letters submitted by the County as exhibits.  (*See* Dkt. No. 201-3, Declaration of Cordell, Exs. G, I, and O.)  The letters were composed by counsel for the County and addressed to the insurer's attorneys – ICSOP moves, on grounds of hearsay, for the exhibits to be stricken as proof of the costs expended by the County.  But the letters were not submitted as proof of exhaustion, they were submitted as evidence that the County had communicated with ICSOP regarding the exhaustion issue (and directed them to the location where the insurer could verify the amount already expended).

The Court denies Defendant's motion to strike the County's declaration and exhibits on the grounds stated.  On that basis, the Court further finds it unnecessary to (1) consider the supplementary evidence submitted by the County in response to ICSOP's objections (Dkt. No. 215, Second Supplemental Declaration of Genster) or (2) rule on the insurer's surreply objections

---

[16] Oxford English Dictionary, 2017; *see* OED.com.

to the supplementary evidence. (Dkt. No. 218, ICSOP Surreply.) The evidence submitted by the County in conjunction with their moving papers is admissible and sufficient for the purpose for which it was presented.

### IV. Conclusion

Defendant ICSOP's objections to the County's evidence are not well-taken. There is no genuine dispute as to any material fact concerning the issues before the Court. In order to trigger ICSOP's duty to defend, the County is required only to establish that the claims against it in the Underlying Litigation were "conceivably covered" by their ICSOP policies, and that it had demonstrated "exhaustion" of its self-insured retention in the course of defending itself. The Court finds that the County has succeeded in establishing both and on that basis is entitled to summary judgment as a matter of law as regards ICSOP's duty to defend and breach of that duty.

The clerk is ordered to provide copies of this order to all counsel.

Dated August _18_, 2017.

Barbara Jacobs Rothstein
U.S. District Court Judge